UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHARLES LATTERELL,

                     Petitioner,                **DECISION AND ORDER**
          -vs-                                                       No. 03-CV-6506

JAMES CONWAY, Superintendent,

                     Respondent.
_____

## INTRODUCTION

Charles Latterell ("Latterell" or "petitioner") filed a *pro se* petition in this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his 1999 conviction in Monroe County Court for various sexual offenses and assault. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On the morning of June 26, 1999, Elana Shandalov ("the complainant") was beaten and sexually assaulted as she left Bally's Health and Fitness Center ("Bally's") in the Town of Henrietta following her workout. Latterell fled the scene in his van but was arrested later that day after the police were able to trace his license plate number. On August 5, 1999, a Monroe County grand jury returned an indictment charging Latterell with multiple counts of first degree sodomy, attempted first degree sodomy, aggravated second degree sexual abuse, and third degree assault.

Trial commenced on November 8, 1999, in Monroe County Court (Marks, J.). The proof at trial revealed that at about 8:15 a.m., as the complainant was walking towards her parked car

after leaving Bally's, she noticed Latterell sitting in a green van. The complainant had entered her car when Latterell approached her. She asked him what he wanted, and he responded, "I want to lick your pussy." Latterell then opened her driver's side door and pushed her. T.230-33, 251.[1] At that point, the complainant observed a pair of scissors and a blue cloth in petitioner's hands. Latterell told her, "You don't want me to kill you, do you?" When the complainant replied, "No," Latterell told her that he wanted to take her to a motel. T.235. As the complainant struggled to escape, Latterell struck her in the head and body several times with his fist. The complainant also sustained injuries from the scissors he was holding. T.237-38. As the complainant screamed for help, Latterell unsuccessfully attempted to gag her. The complainant managed to break free from his grasp and escape the car. T.239-40.

However, petitioner quickly caught up with her and dragged her to a secluded area in the parking lot where he violently pulled up her skirt, ripped off her panties, and digitally penetrated her vagina. T.242-45. During the assault, the complainant attempted to engage petitioner in conversation and negotiate herself out of further abuse; for instance, she asked petitioner about his wedding ring and why he could not find a girlfriend with whom to do this. T.242-45. Latterell then sodomized the complainant by putting his mouth on her vagina; he again told her that he wanted to take her to a motel. The complainant responded, "If you want to rape me, rape me here, I'm not going anywhere." Petitioner stated that he wanted oral sex from her and moved closer. He unzipped his pants and exposed his penis to her. As he did so, the complainant noticed petitioner's underwear, which she recognized at trial. T.245-46, 259-61.

As Latterell attempted to arouse himself, the complainant noticed that he was constantly

---

[1] Citations to "T.__" refer to the trial transcript.

glancing around the parking lot. Seeing this as a chance to escape, the complainant jumped up and started to run away. Petitioner chased her and grabbed at her skirt, but the complainant managed to break free and run towards people standing the parking lot, screaming that she had been raped. T.247-49.

Minutes before that, as probation officer John Zito ("Zito") was leaving Bally's, he heard a woman screaming for help. He went to investigate and, from about twenty yards away, saw the complainant fleeing from Latterell who was in the midst of zipping up his pants. T.286-87, 291, 293. Zito saw something blade-like in petitioner's hands as petitioner attempted to pull the complainant down to the ground. Zito drew out his off-duty pistol and ordered petitioner to stop and get down. T.293. Petitioner ignored this command and continued to run toward Zito. T.294-98.

Petitioner them jumped into his van and attempted to hit Zito by backing into him. Zito fired his gun at the van as petitioner drove away and managed to write down a partial license plate number. T.300-03. Zito then engaged in a car chase with petitioner but lost sight of him. Zito flagged down a sheriff's patrol cruiser and informed the deputies of what had just transpired at Bally's. T.303-07, 348-51. Zito described the victim as beaten and severely injured and recalled that petitioner had dropped the blade-like item he was holding before he fled the scene. T.317.

Ed White ("White") and his step-daughter, Mary Phillips ("Phillips"), observed the aftermath of petitioner's attack on the complainant and Zito's pursuit of Latterell. Phillips assisted the complainant into Bally's while Zito chased after petitioner. White and Phillips then joined in the car chase and testified about how petitioner repeatedly rammed his van into White's

car in an attempt to lose him. T.322, 335-36. As a result, the front license plate of petitioner's van fell off; the police later recovered it and used it to obtain petitioner's name. T.340, 354-57, 368. White attempted to open the driver's side door of petitioner's van while they were stopped at a light, but he failed and soon lost sight of the van in traffic. T.338.

At the crime scene, the police recovered a pair of scissors from inside the complainant's car. They also found the blue cloth petitioner used to try and subdue the victim near the car, and they located the complainant's panties nearby. T.223, 358-62, 370. The complainant identified petitioner, as well as the scissors and the blue cloth, at trial. T.236, 259-61.

That evening, deputies from Ontario County Sheriff's Department located petitioner sitting in his van. He had cut his wrists in an apparent suicide attempt, so the police brought him to the hospital for treatment. T.380-85. While at the hospital, Deputy Paul Hagen ("Hagen") described petitioner as calm, cooperative and coherent. According to Hagen, petitioner stated that he had relapsed into using cocaine and did not want to hurt anyone else. T.386. However, Latterell refused to give a statement to police and asked for an attorney; the public defender's office then was notified. Subsequently, pursuant to a search warrant, the police recovered hypodermic syringes in petitioner's van. T.396-97, 412. The police also seized petitioner's underwear as evidence, which the complainant identified at trial. T.259-61.

Petitioner's trial counsel put forward a defense of intoxication, claiming that petitioner was too high on cocaine to have formed the necessary intent to commit the crimes with which he was charged; she argued that petitioner's actions were not those of a "rational man." T.209. Latterell took the stand and testified that he was a long-time cocaine addict. T.439. He described how he had injected himself with five doses of cocaine on the morning of the incident before

going to work and had driven to Bally's where he parked his van and injected more cocaine. T.441-44. He stated that he injected himself with an "extremely large amount" at Bally's. T.445. Latterell described feeling extremely paranoid and suffering hallucinations just prior to the attack. T.442, 445. He also testified that he had slit his wrists in a suicide attempt after the attack. T.451-52. Latterell stated that he did not have control over his actions on the morning of the incident. T.447. He did not recall threatening to kill the complainant. T.446-48. On cross-examination, petitioner admitted that he had driven his van without incident prior to and after the attack. T.456-57, 459-60. He conceded that he had approached the complainant's car under his own power and recalled telling her that he wanted to perform oral sex on her and take her to a motel. T.467-68, 468-69, 478. Petitioner admitted to removing the complainant's panties and unzipping his pants. T.471. He recalled telling the complainant that he wanted a "blow job", unzipping his pants, and taking out his penis. T.479.

The jury returned a verdict convicting petitioner of all charges in the indictment. T.531-32. The court sentenced petitioner, who had three prior felony convictions, to consecutive sentences of twenty-five years to life on the first degree sodomy count and twenty years to life of the attempted first degree sodomy count, making his aggregate sentence forty-five years to life.

On direct appeal, appellate counsel argued (1) that the prosecutor had committed misconduct and (2) that although consecutive sentences were authorized under New York Penal Law § 70.25(2), the aggregate sentence was unduly harsh and severe. Latterell submitted a *pro se* supplemental brief arguing that he was denied the effective assistance of trial counsel. The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed the conviction on February 1, 2002. *People v. Latterell*, 291 A.D.2d 881, 737 N.Y.S.2d

568 (App. Div. 4th Dept. 2002). The New York Court of Appeals denied leave to appeal on April 19, 2002. *People v. Latterell*, 98 N.Y.2d 638, 771 N.E.2d 840, 744 N.Y.S.2d 767 (N.Y. 2002).

Acting *pro se*, Latterell then collaterally attacked his conviction by means of a motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") 440.10, arguing that he was denied the effective assistance of trial counsel because counsel failed to obtain expert testimony to support a defense of "diminished capacity due to acute cocaine psychosis" and that there was a "total breakdown in communication" between counsel and himself. App. N at 218.[2] Latterell also contended that his consecutive sentences were invalid as a matter of law. *Id.*

The trial judge denied Latterell's C.P.L. 440.10 motion in a written decision and order entered June 25, 2003. *See* App. P at 251-53. The trial court denied the application on the basis that petitioner failed to submit sworn allegations to substantiate the facts necessary to support his claims. *Id.* The trial court then went on to address the merits of petitioner's claims and found that he received meaningful representation from trial counsel. The trial court observed that when a claim of ineffective assistance of counsel is based upon counsel's alleged failure to call a witness, the moving papers must contain an affidavit from such witness setting for the substance of the proposed testimony; petitioner failed to do this, however. *Id.* (citations omitted). The trial court also found that petitioner's allegations regarding the "communication breakdown" were conclusory. *Id.* Leave to appeal this decision was denied by the Appellate Division.

This habeas petition followed in which Latterell raises the following grounds for relief: (1) he was deprived of the effective assistance of counsel due to counsel's failure to obtain an

---

[2] Citations to "App. X at __" refer to respondent's Appendix of Exhibits attached to its Answer (Docket #5).

-6-

expert witness; (2) the trial court erred in refusing to substitute assigned counsel even though there was an "irreconcilable conflict" between petitioner and counsel; and (3) the imposition of consecutive sentences was invalid as a matter of law. Respondent answered the petition and interposed the defenses of non-exhaustion and procedural default. Contrary to respondent's contention, all of petitioner's claims are fully exhausted; he raised them in his C.P.L. 440.10 motion and completed one full round of state-court review by appealing the trial court's denial of the motion. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional claims by invoking one complete round of the State's established appellate review process."). Furthermore, none of the claims are procedurally defaulted. Thus, all three claims are properly before this Court on habeas review.

For the reasons set forth below, the petition is denied.

### DISCUSSION

**Standard of Review**

To prevail under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

**Merits of the Petition**

**1.      Conflict of interest**

According to Latterell, trial counsel's alleged failure to obtain an expert witness to testify that he was suffering from "acute cocaine psychosis" at the time of the incident was "the crux" of an "irreconcilable conflict" between them. Petitioner's Memorandum of Law ("Pet'r Mem.") at 7 (Docket #2).

During jury selection, defense counsel informed the trial court that Latterell had some matters he wished to place on the record. T.28. Apparently, Latterell had sent counsel a five-page handwritten letter dated October 29, 1999, in which he expressed dissatisfaction with her handling of his case.[3] The trial judge informed Latterell that she would go "issue by issue" through the letter, although she did not want to disclose the defense strategies discussed therein. T.29. She informed Latterell that the defense of "diminished capacity [which he had discussed in the letter] is a movie version or another state [*i.e.* law from another jurisdiction]" and that it "is not, *per se*, considered." *Id.* The court told Latterell that she was "not sure what exactly [he was] requesting" and that "[t]here would be no plea offer that would result in a ten year sentence" (as

---

[3] The letter read, in relevant part, as follows: "When I saw you, subsequently . . . you told me that you were going to seek an intoxication defense. However, the expert that you say you contacted, from Albert Einstein University, said that she would not testify because she felt that I did not fit under "acute cocaine psychosis." This, I suppose, correlates with temporary insanity. Tonight you informed me that an intoxication defense would not do because I would have to take the witness stand and, in doing, my past record would be revealed. Your defense strategy. . . is to aim for a reduced charge of attempt. Throughout these proceedings I have thought it most appropriate that a diminished capacity/intox., and/or extreme emotional disturbance defense be sought. . . . Ms. Russell, for what it's worth to you, I was certainly out of my mind. I was suffering from a variety of things, amongst which, I feel are tantamount to an extreme (emotional) disturbance, born from drug ingestion . . . . That said . . . in reviewing the victim's statement I do not see, as you do, a sound defense strategy of seeking an attempt conviction, rather than the act itself. . . .On the same note, it is foolish to accept a plea offer of 20 or 25 yrs. to life. . . . Why not intox. & extreme emotional disturbance <u>and</u> attempt? . . . I will like to . . . discuss what type of experts may be available & to what aspect of my case they may be utilized. . . . What is also clear is that we are by <u>no means</u> prepared for trial . . . so I ask you as counsel, to obtain the necessary adjournment(s) so that our defense needs can be facilitated, and I can be afforded the effective assistance of counsel. . . . Finally, if at all possible, I am willing to accept a plea offer of, taking into consideration the 3 ½ years that I owe parole, a total of ten (10) years. . . ." App. R. at 280-85 (emphasis in original).

he mentioned in the letter) since that was "not on the table, never was on the table, and never would be on the table." The judge commented that defense counsel had been working "vigorously" to "secure some type of sentence" that would be "more reasonable than has been put out by the People."

When asked if she was ready for trial, defense counsel replied affirmatively and stated, "I feel that if I respond to it [the letter], that it puts me in conflict with my client." Trial counsel noted that Latterell's case had been "the subject of at least three case conferences in [her] office" and had "been highly researched and prepared for." Trial counsel stated that because her client had indicated that he did not wish her to proceed with trial, she was in a position where she felt the need to make an application to the court to withdraw, based on their "irreconcilable differences."

The trial court noted that Latterell was "reasonably intelligent" and had "knowledge of a number of the issues in the case" but also declared that she was confident in defense counsel's representation of him. The judge observed that requests for substitution of counsel frequently are no more than delaying tactics and that Latterell had not "articulated anything that really warrants a change of attorney or adjournment." T.31. Accordingly, the trial court denied Latterell's application and suggested that he cooperate with defense counsel in preparation of his defense. T.32. When asked if he had anything else he wished to say, Latterell replied, "No, your Honor." *Id.* The case proceeded to trial, and trial counsel advanced a defense based on arguing that Latterell's copious use of cocaine immediately before the attack negated his ability to form the necessary criminal intent.

"Once trial has begun a defendant does not have the unbridled right to reject assigned

counsel and demand another." *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972), *cert. denied*, 410 U.S. 926 (1973); *accord McKee v. Harris*, 649 F.2d 927, 931 (2d Cir. 1981). Because the right to counsel of one's choice is not absolute, a trial court may require a defendant to proceed to trial with counsel not of defendant's choosing. *United States v. Schmidt*, 105 F.3d 82, 89 (2d Cir. 1997). As the Supreme Court has explained, the Sixth Amendment "guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Caplin & Drysdale v. United States*, 491 U.S. 617, 624 (1989). *See also Wheat v. United States*, 486 U.S. 153, 158 (1988) ("[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers"); *United States v. Cronic*, 466 U.S. 648, 657 n. 21 (1984) ("[T]he appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such. If counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance.") (citing *Jones v. Barnes*, 463 U.S. 745 (1983); *Morris v. Slappy*, 461 U.S. 1 (1983)). However, a trial court may not compel a defendant to proceed with incompetent counsel. *Schmidt*, 105 F.3d at 89.

A defendant's belated request for substitution of counsel is granted only where there exists "good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict." *McKee*, 649 F.2d at 931 (internal quotation marks and citations omitted). *See also Schmidt*, 105 F.3d at 89 ("On the eve of trial, just as during trial, a defendant can only substitute new counsel when unusual

circumstances are found to exist, such as a complete breakdown of communication or an irreconcilable conflict"); *United States v. Llanes*, 374 F.2d 712, 717 (2d Cir. 1967) ("Judges must be vigilant that requests for appointment of a new attorney on the eve of trial should not become a vehicle for achieving delay"). Although a defendant's "loss of trust" should be considered when assessing whether good cause for the substitution of assigned counsel exists, the defendant "must nevertheless afford the court with legitimate reasons for the lack of confidence." *McKee*, 649 F.2d at 932. If the trial court receives a "seemingly substantial" complaint from a defendant about his counsel, it has a duty to inquire into the reasons for dissatisfaction. *Id.* at 933.

Here, after being apprised of Latterell's concerns, the trial court held a brief hearing on the record to explore Latterell's reasons for his dissatisfaction with assigned counsel. The factual findings of the trial court, set forth in the preceding paragraphs of this opinion, are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). This Court may disregard them only if Latterell comes forward with "clear and convincing evidence" that they are incorrect. *See id.* This he has failed to do.

Moreover, the Court has found no authority for the proposition Latterell urges here–that mere disagreement about the best defense strategy to pursue amounts to "good cause" or gives rise to an "irreconcilable conflict." *See Morton v. Foltz*, 782 F.2d 1042, 1042 (6th Cir. 1985) (finding that defendant's disagreement with counsel about the law, in light of the attorney's statement that he was ready to proceed, and trial court's finding that the attorney was in fact prepared to try the case, was not good cause; "[a] criminal defendant does not have a constitutional right to an attorney with whom he agrees.") (citing *McKee*, 649 F.2d at 931);

*United States v. Simeonov*, 252 F.3d 238, 241 (2d Cir. 2001) (holding that defendant was not entitled to substitute defense counsel during sentencing phase of prosecution for conspiracy to pass counterfeit currency and illegal reentry into the United States after deportation, although defendant and counsel disagreed as to trial strategy; counsel advised court that he met with his client three times during the week prior to sentencing hearing, and counsel advocated aggressively on defendant's behalf in cross-examining governments witnesses and during closing remarks).

Contrary to Latterell's contention, he did not have an absolute right to dictate the defense strategy to be followed in his case. The Supreme Court explicitly has held that tactical decisions such as trial strategies or the questioning of witnesses are left to the discretion of appointed counsel. *Jones v. Barnes*, 463 U.S. at 751 (stating that tactical decisions are left to counsel's professional judgment); *see also Faretta v. California*, 422 U.S. 806, 820 (1975) (noting that "when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy").  Nor has Latterell shown that a "breakdown in communication" occurred between him and defense counsel. In fact, according to Latterell, he had "seen and spoken with [defense counsel] approximately six times since the inception of [the criminal proceeding]." *See Byas v. Keane*, 1999 WL 608787, at *7-*10 (S.D.N.Y. Aug. 12, 1999) (petitioner failed to show any legitimate reason for dissatisfaction despite asserting that counsel had "set no defense" and had not properly consulted with him).

In sum, after reviewing the trial transcript in its entirety, it is evident that the state trial court did not abuse its discretion in deciding that the conflict between Latterell and his attorney

was not "'so great that it had resulted in total lack of communication preventing an adequate defense.'" *Simeonov*, 252 F.3d at 241 (quoting *United States v. Morrissey*, 461 F.2d 666, 670 (2d Cir. 1972)). In fact, no conflict impairing counsel's ability to render effective assistance existed; at most, disagreements arose concerning various aspects of trial strategy. That is insufficient to overturn the decision of the state court to refuse to substitute assigned counsel based on Latterell's "eleventh hour" request. Habeas relief will not issue on this claim.

**2.     Ineffective assistance of counsel**

   **a.     Legal standard**

In order to prevail on a claim of ineffective assistance of counsel within the framework established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner must satisfy a two-part test. First, a petitioner must demonstrate that counsel's performance was so deficient that counsel was not functioning as "counsel" within the meaning of the Sixth Amendment to the Constitution. *Id.* at 688. In other words, a petitioner must show that his attorney's performance "fell below an objective standard of reasonableness." *Id.* Second, a petitioner must show that counsel's deficient performance prejudiced him. *Id.* at 694. To establish the "prejudice" prong of the *Strickland* test, a petitioner must show that a "reasonable probability" exists that, but for counsel's error, the outcome of the trial would have been different. *Id.* at 694.

   **b.     Alleged ineffectiveness: failure to obtain an expert witness**

Latterell contends that trial counsel was deficient because she "refused to obtain an expert witness" and "refused to obtain documents that would of [*sic*] conclusively shown that defendant was addicted to cocaine, had been for a [*sic*] extended period of time, and was

intoxicated on the drug at the time of the commission of the crime." Pet'r Mem. at 3 (Docket #2). He berates counsel for "ultimately us[ing] said defense of [acute cocaine psychosis] without the benefit of any documentation of prior drug abuse and/or the testimony of an expert to explain to the jury the intricate working of the drug altered mind." *Id.*

At the outset, since Laterell's argument includes a reference to drug intoxication as a defense, it is noted that he was given the benefit of a specific instruction on the defense of intoxication.[4]  Moreover, the Court notes that trial counsel did not "refuse" to obtain an expert witness on the issue of acute cocaine psychosis. To the contrary, trial counsel consulted with at least one expert who stated that, in her opinion, Latterell was not suffering from "acute cocaine psychosis." *See* App. R at 280. Latterell essentially is arguing that trial counsel was constitutionally obligated to "witness shop" and locate an expert who would testify that Latterell suffered from acute cocaine psychosis.  The Court is unaware of any state or federal authority for the proposition urged by Latterell, although it does note that in several recent cases regarding allegations of sexual abuse against children, the Second Circuit has found that trial counsel was ineffective where the failure to call a medical expert was based on an insufficient investigation of defendant's case. *See Pavel v. Hollins*, 261 F.3d 210, 223 (2d Cir. 2001) (holding that counsel

---

[4] The trial court instructed the jury in relevant part that "[u]nder our law, intoxication, as such, is not a defense to a criminal charge, but, in any prosecution for an offense, evidence of intoxication may be offered whenever such evidence is relevant to negative an element of the crime charged. In this case, the People must prove beyond a reasonable doubt that the defendant acted intentionally as to each of the crimes charged. . . .[T]he law does provide that evidence of intoxication may be considered by you in determining whether the defendant possessed the requisite intent, which is an essential element of each of these crimes charges. Thus, you, the jury, may consider evidence of intoxication by drugs in determining whether or not the mind of the defendant was so obscured by drugs that he was incapable of forming the particular criminal intent[.] . . .It is only where the intoxication is of such a degree, character and extent as to deprive the defendant of the power to form a particular intent, that he is relieved of, under the law, of criminal responsibility for his conduct. . . . T.524-26.

was ineffective in a child sexual abuse case where his failure to call a medical expert was based on an insufficient investigation); *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001) (same). Those cases are distinguishable on their facts, making it illogical to extend them to the present context. Morever, in both cases, the Second Circuit applied the less deferential pre-AEDPA habeas statute. Even assuming, for the sake of argument, the counsel was constitutionally deficient in failing to obtain an expert witness to testify regarding Latterell's alleged cocaine psychosis, the claim still must fail because Latterell is unable to show prejudice, which is a "reasonable probability" that the outcome of the trial would have been different had the expert testified as hoped.

"Acute cocaine psychosis," although apparently a recognized phenomenon, is not the same as a "functional psychosis." *See People v. Gillis*, 281 A.D.2d 698, 721 N.Y.S.2d 690 (App. Div. 3d Dept. 2001). In *Gillis*, the psychiatrist who evaluated defendant after the incident opined that defendant's behavior was triggered by a "drug-induced psychosis precipitated by his excessive use of cocaine and PCP" and that defendant "lacked the capacity to know right from wrong." *Id.* The expert had to concede however, that the psychosis "was self-induced and that when defendant was not under the influence of drugs, he exhibited no signs of a functional or 'real' psychosis." *Id.* Furthermore, defendant Gillis's "own conduct subsequent to the incident was inconsistent with an individual suffering from a functional psychosis." *Id.* Thus, the court found that defendant's insanity defense suffered from a failure of proof. A functional psychosis is defined as "[a] severe mental disorder, with or without organic damage, characterized by derangement of personality and loss of contact with reality and causing deterioration of normal social functioning." *American Heritage Dictionary of the English Language* (4th ed. 2004). As

was the case in *Gillis*, Latterell's alleged psychosis was self-induced. Moreover, the only medical records proffered by Latterell in support of his state court applications for relief belie the notion that he suffered from a mental illness, let alone a "severe mental disorder" such as psychosis. To the contrary, when he was examined by the Monroe County Office of Mental Health in 1993 in connection with another criminal charge, the nurse found that he did "not have a mental health problem" and was able to be "routinely adjudicated." *See* App. R at 290. Finally, even if Latterell could have established that he was suffering from a functional psychosis, the jury still was free to find that he was able to distinguish between right and wrong at the time of the assault. As the Eighth Circuit cogently explained, "Diagnoses of 'psychosis ,' 'schizophrenia,' or other mental disorders must be made using the methodology and assumptions of psychiatric medicine, *which are not necessarily the same as those of the criminal law*. Just as the law of insanity does not incorporate the changing and often vague categories of contemporary psychiatric method, psychiatric definitions of psychosis do not necessarily entail the legally significant notions of right and wrong." *United States v. Dubray*, 854 F.2d 1099, 1102 (8th Cir. 1988) (emphasis supplied) (cited in *United States v. DiDomenico*, 985 F.2d 1159, 1193 (2d Cir. 1993)). As the evidence on the record was overwhelming that Latterell acted intentionally before, during and after the attack, there is no reasonable probability that an expert witness could have "tipped the scales" in favor of the jury finding a reasonable doubt about Latterell's culpability. This claim does not warrant habeas relief.

**3.     Illegality of consecutive sentences**

Latterell contends that the trial court illegally imposed consecutive sentences of imprisonment with regard to the sodomy and attempted sodomy counts in violation of New York

Penal Law § 70.25(2), which provides that "[w]hen more than one sentence of imprisonment is imposed on a person for two or more offenses committed through a single act or omission, or through an act or omission which in itself constituted one of the offenses and also was a material element of the other, the sentences . . . must run concurrently." N.Y. Penal Law 70.25(2). However, based on the proof at trial, the sodomy and attempted sodomy were not committed through a single act or omission. Latterell attempted to orally sodomize the complainant in the car; she then briefly escaped, and when Latterell captured her again, he orally sodomized her and attempted to force her to perform oral sex on him. Thus, given these facts, the state court did not abuse its discretion in imposing consecutive sentences. *People v. Willard*, 226 A.D.2d 1014, 641 N.Y.S.2d 896 (App. Div. 3d Dept. 1996) (holding that consecutive sentences were not improper where it was "clear that [defendant] sexually abused the complainant, exited the vehicle and then proceeded to orally sodomize her prior to forcibly subjecting her to the separate act of sexual intercourse"); *People v. Smithers*, 255 A.D.2d 916, 683 N.Y.S.2d 680 (App. Div. 4th Dept. 1998) (holding that the evidence did not support defendant's contention that the first act of sodomy was "part and parcel of the continuous conduct culminating" in the second act of sodomy; because defendant engaged in two separate and distinct acts of sodomy, and neither completed offense was a material element of the other offense, the trial court properly imposed consecutive sentences). As Latterell's consecutive sentences were not illegal and were within the statutory limits, he has no other challenge to the term of imprisonment imposed. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (holding that a challenge to the term of a sentence does not present a cognizable constitutional issue if the sentence falls within the statutory range). Habeas relief on this claim is denied.

## CONCLUSION

For the reasons stated above, petitioner Charles Latterell's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is dismissed as untimely. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*
_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:   April 25, 2006
         Rochester, New York.